**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Gregory Wersal,

        Plaintiff,

    v.

Patrick D. Sexton, in his official capacity as
Chair of the Minnesota Board on Judicial
Standards; William J. Egan, in his official
capacity as a Member of the Minnesota Board
on Judicial Standards; Douglas A. Fuller, in
his official capacity as a Member of the
Minnesota Board on Judicial Standards; Jon
M. Hopeman, in his official capacity as a
Member of the Minnesota Board on Judicial
Standards; Cynthia Jepsen, in her official
capacity as a Member of the Minnesota Board
on Judicial Standards; E. Anne McKinsey, in
her official capacity as a Member of the
Minnesota Board on Judicial Standards; Gary
Pagliaccetti, in his official capacity as a
Member of the Minnesota Board on Judicial
Standards; James Dehn, in his official
capacity as a Member of the Minnesota Board
on Judicial Standards; The Honorable Terri
Stoneburner, in her official capacity as a
Member of the Minnesota Board on Judicial
Standards; Randy R. Staver, in his official
capacity as a Member of the Minnesota Board
on Judicial Standards; Kent A. Gernarder, in
his official capacity as Chair of the Minnesota
Lawyers Professional Responsibility Board;
Vincent A. Thomas, in his official capacity as
Vice-Chair of the Minnesota Lawyers
Professional Responsibility Board; Kathleen
Clarke Anderson, in her official capacity as a
Member of the Minnesota Lawyers
Professional Responsibility Board; Mark R.
Anway, in his official capacity as a Member
of the Minnesota Lawyers Professional
Responsibility Board; Robert B. Bauer, in his
official capacity as a Member of the
Minnesota Lawyers Professional

**MEMORANDUM OPINION**
**AND ORDER**
Civil No. 08-613 ADM/JSM

Responsibility Board; William P. Donohue, in
his official capacity as a Member of the
Minnesota Lawyers Professional
Responsibility Board; Joseph V. Ferguson, III,
in his official capacity as a Member of the
Minnesota Lawyers Professional
Responsibility Board; Wood R. Foster, Jr., in
his official capacity as a Member of the
Minnesota Lawyers Professional
Responsibility Board; Susan C. Goldstein, in
her official capacity as a Member of the
Minnesota Lawyers Professional
Responsibility Board; Sherri D. Hawley, in
her official capacity as a Member of the
Minnesota Lawyers Professional
Responsibility Board; Lynn J. Hummel, in her
official capacity as a Member of the
Minnesota Lawyers Professional
Responsibility Board; Geri L. Krueger, in her
official capacity as a Member of the
Minnesota Lawyers Professional
Responsibility Board; Ann E. Maas, in her
official capacity as a Member of the
Minnesota Lawyers Professional
Responsibility Board; Marne Gibbs Hicke, in
her official capacity as a Member of the
Minnesota Lawyers Professional
Responsibility Board; Mary L. Medved, in her
official capacity as a Member of the
Minnesota Lawyers Professional
Responsibility Board; Richard H. Kyle, Jr., in
his official capacity as a Member of the
Minnesota Lawyers Professional
Responsibility Board; David A. Sasseville, in
his official capacity as a Member of the
Minnesota Lawyers Professional
Responsibility Board; Michael W. Unger, in
his official capacity as a Member of the
Minnesota Lawyers Professional
Responsibility Board; Debbie Toberman, in
her official capacity as a Member of the
Minnesota Lawyers Professional
Responsibility Board; Dianne A. Ward, in her
official capacity as a Member of the

2

Minnesota Lawyers Professional
Responsibility Board; Daniel R. Wexler, in his
official capacity as a Member of the
Minnesota Lawyers Professional
Responsibility Board; Stuart T. Williams, in
his official capacity as a Member of the
Minnesota Lawyers Professional
Responsibility Board; Jan M. Zender, in her
official capacity as a Member of the
Minnesota Lawyers Professional
Responsibility Board,

                    Defendants.

_____

James Bopp, Jr., Esq., Bopp, Coleson & Bostrom, Terre Haute, IN, and Stanley N. Zahorsky,
Esq., Zahorsky Law Firm, Edina, MN, argued on behalf of Plaintiff.

Steven M. Gunn, Esq., and Thomas C. Vasaly, Esq., Office of the Minnesota Attorney General,
St. Paul, MN, argued on behalf of Defendants.

_____

# I. INTRODUCTION

On October 24, 2008, the undersigned United States District Judge heard oral argument
on Plaintiff Gregory Wersal's ("Wersal") Motion for Summary Judgment [Docket No. 37] and
the above-captioned Defendants' ("Defendants") Motion for Summary Judgment [Docket No.
26]. Wersal raises First Amendment challenges to three provisions of the Minnesota Code of
Judicial Conduct. The Canons in dispute prohibit a judicial candidate (1) from publicly
endorsing or opposing candidates for public office in election contests other than the one in
which he is a candidate, (2) soliciting funds for a political organization, and (3) personally
soliciting campaign contributions. For the reasons stated below, Wersal's motion is denied, and
Defendants' motion is granted.

## II. BACKGROUND

On March 4, 2008, Wersal filed this suit challenging Canon 5A(1)(b) and (d) and Canon 5B(2) of the Minnesota Code of Judicial Conduct. In relevant part, Canon 5A(1)(b) (the "endorsement clause") prohibits a judge or candidate for election to judicial office from "publicly endors[ing] or, except for the judge or candidate's opponent, publicly oppos[ing] another candidate for public office." Canon 5A(1)(d) (the "soliciting for a candidate clause") prohibits a judge or judicial candidate from "solicit[ing] funds for or pay[ing] an assessment to or mak[ing] a contribution to a political organization or candidate, or purchas[ing] tickets for political party dinners or other functions." Finally, Canon 5B(2) (the "solicitation clause") prohibits a judge or judicial candidate from "personally solicit[ing] campaign contributions . . . and [the judge or candidate] shall not personally accept campaign contributions." Judges and judicial candidates may, however, establish committees that solicit and accept campaign funds or public statements of support. Id. These committees are prohibited from disclosing to the judicial candidate the identity of campaign contributors or those that decline to contribute to the campaign. Id. Judges and candidates may make general requests for campaign contributions when speaking to groups of twenty or more people, and they may sign letters for distribution by the candidate's campaign committee, as long as the letter directs contributions to the committee and not the candidate. Id.

Wersal requested that the Court issue a preliminary injunction on March 21, 2008. Mot. for Prelim. Inj. [Docket No. 9]. At the time, Wersal alleged that he was a candidate for Justice of the Minnesota Supreme Court in 2008. Pl.'s Mem. in Supp. of Prelim. Inj. [Docket No. 10] at 2. Because Wersal did not file for candidacy prior to the July 15, 2008 deadline, the motion for

4

injunctive relief was denied.  July 22, 2008 Mem. Opinion and Order [Docket No. 25] at 5, 6.

Wersal attempted to salvage his claim for injunctive relief by declaring he is "currently a

candidate for the office of Justice of the Minnesota Supreme Court in 2010."  Wersal Decl.

[Docket No. 24] ¶ 8.  The Court found the threat of irreparable harm to a candidacy in 2010 to be

"too speculative and remote to warrant a preliminary injunction."  July 22, 2008 Mem. Opinion

and Order at 6.  Following this ruling, the parties filed cross motions for summary judgment.

### III. DISCUSSION

#### A.      Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion

for summary judgment, the Court views the evidence in the light most favorable to the

nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party

may not "rest on mere allegations or denials, but must demonstrate on the record the existence of

specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953,

957 (8th Cir. 1995).

#### B.      Justiciability of Wersal's Claims

Defendants argue that Wersal's Complaint is not justiciable because an actual

controversy did not exist at the time the Complaint was filed and does not exist now.  They also

question whether Wersal has standing to bring this claim, whether the conclusion of the 2008 judicial election renders his claim moot, and whether this claim is ripe for adjudication.

### 1.    Standing

Standing is a "threshold issue in determining whether a Federal Court may hear a case." Republican Party of Minn., Third Congressional Dist. v. Klobuchar, 381 F.3d 785, 791 (8th Cir. 2004).  Under Article III of the Constitution, a party bringing a claim bears the burden of establishing that he has standing.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  At a minimum, standing requires a "case or controversy" in which (1) the plaintiff has suffered a "concrete and particularized" injury in fact that is "actual and imminent, not conjectural or hypothetical;" (2) "there must be a causal connection between the injury and the conduct complained of;" and (3) the injury must be capable of being "redressed by a favorable decision." Id. at 560 (internal quotations and citations omitted).  When, as here, a plaintiff asserts a facial overbreadth claim under the First Amendment, "actual injury can exist for standing purposes even if the plaintiff has not engaged in the prohibited expression as long as the plaintiff is objectively reasonably chilled from exercising his First Amendment right to free expression in order to avoid enforcement consequences."  Klobuchar, 382 F.3d at 792.  This injury maintains a "credible threat of prosecution . . . if the plaintiff actually engages in the prohibited expression." Id.

Defendants argue that because Wersal never filed as a candidate for judicial office in 2008, he lacks standing to challenge the Canons of Judicial Conduct.  They also argue that Wersal lacks standing for future elections because, in spite of his intention to seek judicial office, he is not yet a "candidate" for judicial office in 2010.  Although Wersal has not pursued elected

office with the vigor expected of a sincere political candidate, his reasons for choosing not to

pursue his 2008 candidacy appear legitimate.  Wersal explains he initially planned to run against

Chief Justice Russell Anderson in 2008.  Wersal Decl. [Docket No. 24] ¶ 2.  Because Chief

Justice Anderson resigned before the election and Eric Magnuson was appointed to the position,

Chief Justice was no longer a position on the 2008 ballot.  Id. ¶ 3.  Wersal claims he considered

challenging Justice Paul Anderson but did not do so because he felt constrained by the contested

canons and had been unable to secure a preliminary injunction prior to the candidate filing

deadline.  Id. ¶¶ 4-7.

Defendants respond that Wersal's Complaint is misleading because he is characterized as

a candidate for office but his candidacy was conditioned on the issuance of a preliminary

injunction.  Defs.' Mem. in Supp. of Summ. J. [Docket No. 36] at 8.  Wersal did not allege the

prerequisite of the preliminary injunction being issued before he would be a candidate, but he

was not required to do so.  Wersal had been the subject of complaints for violating election

prohibitions in 1996 and 1997.  He had sought guidance from the Minnesota Office of Lawyers

Professional Responsibility and thus, could reasonably believe there was a "credible threat of

prosecution" if he were to engage in prohibited activities as part of his campaign.  See

Klobuchar, 382 F.3d at 792; Compl. ¶¶ 13, 19, 29, 43.  Wersal's injury was sufficiently concrete,

a causal connection between the alleged First Amendment violation and the canons exists, and a

favorable decision would redress his injury.

Additionally, Wersal has standing as a candidate for judicial office in 2010.  "A party

becomes a candidate for judicial office as soon as he or she makes a public announcement of

candidacy, declares or files as a candidate with the election authority, or authorizes solicitation

or acceptance of campaign contributions or support."  Code of Judicial Conduct, Canon 5F.

Wersal has not satisfied every potential qualifying event to become a candidate.  He has not

declared or filed as a candidate with the election authority and has not registered a campaign

committee.  See Minn. Stat. §§ 10A.105; 10A.14.  He has, however, declared in publically

accessible court documents that he is "currently a candidate for judicial election in 2010."

Wersal Decl. ¶ 8.  While Canon 5F's "public announcement" requirement likely envisioned a

press conference or press release, the language of the canon itself does not specify how a "public

announcement" is made.  See In re Frederickson, 545 F.3d 652, 656 (8th Cir. 2008) ("[W]hen the

statutory text is plain and does not lead to an absurd result, the sole function of the courts is to

enforce the plain language of the statute).  For these reasons, Wersal has standing to pursue his

claims.

### 2.    Mootness

Defendants next argue that Wersal's claim is moot because he is not a candidate for

election in 2008.  Mootness is "the doctrine of setting a time frame: The requisite personal

interest that must exist at the commencement of the litigation (standing) must continue

throughout its existence (mootness)."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC),

Inc., 528 U.S. 167, 189 (2000).  As mentioned above, Wersal has sufficiently established his

2010 judicial candidacy.  Therefore, Wersal's Complaint is not moot.

### 3.    Ripeness

The ripeness doctrine prevents courts, through premature adjudication, from "entangling

themselves in abstract disagreements."  Thomas v. Union Carbide Agr. Prods. Co., 473 U.S. 568,

580 (1985).  Defendants claim the issues are not ripe for review because Wersal has not shown

concrete plans to pursue his candidacy.  Wersal was briefly a candidate in 2008, has declared his candidacy for 2010, and has identified candidates such as Tim Tinglested and Congresswoman Michelle Bachmann as individuals whom he would like to endorse for future elections.  Wersal Decl. [Docket No. 42] ¶¶ 6, 12.  Wersal is a current candidate who wishes to endorse individual candidates and therefore, his claims challenging the endorsement provision are ripe for adjudication.

Wersal also challenges the soliciting for a candidate provision of Canon 5A(1)(d) because, he maintains, its prohibitions extend "to solicitations by a candidate for his own campaign."[1]  Pl.'s Mem. in Supp. of Summ. J. [Docket No. 38] at 17.  He argues this position based on the language in Canon 5D, which states, "[f]or purposes of Canon 5, the term 'political organization' denotes an association of individuals under whose name a candidate files for partisan office."  Code of Judicial Conduct, Canon 5D.  Therefore, if Wersal were to solicit for his own campaign through his election committee, a "political organization," he would allegedly violate this clause.

The Court finds that Wersal's interpretation of the soliciting for a candidate clause is flawed.  First, the soliciting for a candidate clause has never been applied to a judicial candidate's solicitations for his own campaign.  Cole Decl. [Docket No. 35] ¶ 2.  Second, Wersal has not requested an advisory opinion of the Minnesota Office of Lawyer Professional Responsibility whether the soliciting for a candidate clause would apply to solicitations for his own campaign.  Id. ¶ 3.  Finally, Wersal's interpretation of the solicitation for a candidate clause

---

[1] Additionally, the Complaint does not allege that Wersal seeks to solicit funds for any political organization or candidate other than himself.  See also Pl.'s Mem. in Response to Defs.' Mot. for Summ. J. [Docket No. 46] at 7.

is contrary to the tenet of statutory interpretation that all language should be given meaning.  See

Rowley v. Yarnall, 22 F.3d 190, 192 (8th Cir. 1994).  Under Wersal's interpretation, the

solicitation clause of Canon 5B(2), which allows candidates to form committees that may solicit

and accept campaign contributions on behalf of that candidate as well as speak to large groups of

potential donors and send fund raising requests to supporters, would be rendered a nullity.  The

prohibition against soliciting for a candidate in canon 5A(1)(d) can be read so as not to nullify

canon 5B(2) by applying the prohibition to solicitations for *other* candidates.  For this reason,

Wersal does not face a "credible threat of prosecution" for violating the soliciting for a candidate

clause under Judicial Canon 5A(1)(d), and the likelihood that he would face sanctions for

soliciting for his own campaign in violation of this canon is "abstract."  His claims challenging

the solicitation for a candidate clause of Canon 5A(1)(d) are dismissed for lack of ripeness.

**C.     First Amendment Framework**

Before turning to the merits of the current challenges, some history of Wersal's First

Amendment challenges to the Minnesota Code of Judicial Conduct is helpful to understanding

the context.  In 1996 and 1998, Wersal campaigned for the position of Justice of the Minnesota

Supreme Court.  Compl. [Docket No. 1] ¶¶ 13-14.  Those campaigns led to Wersal challenging

former Judicial Conduct Canons that prohibited judges and judicial candidates from stating their

views on disputed legal and political issues, engaging in certain partisan activities, and

personally soliciting campaign contributions from large groups.  See Republican Party of

Minnesota v. White, 536 U.S. 765 (2002) ("White I"); Republican Party of Minnesota v. White,

416 F.3d 738 (8th Cir. 2005) ("White II").  Because those cases control any analysis of the

endorsement and solicitation clauses, White I and White II warrant discussion.

10

1.    **White I**

In White I, Plaintiffs challenged a former Minnesota Code of Judicial Conduct canon that prohibited "a candidate for judicial office, including an incumbent judge" from "announc[ing] his or her views on disputed legal or political issues." Code of Judicial Conduct, Canon 5(A)(3)(d)(I) (2000).  The challenged aspect of this canon, known as the "announce clause," applied to all lawyers who might be a candidate for a judicial office, and violations of the canon were sanctioned by disbarment, suspension, or probation.  White I, 536 U.S. at 768.  The announce clause allowed a candidate to discuss such topics as character, education, work habits, and how he would handle administrative duties if elected but also served as a blanket prohibition "on any specific nonfanciful legal question within the province of the court for which he [was] running."  Id. at 773.

The Court found the announce clause prohibited speech based on content and burdened core First Amendment speech—"speech about the qualifications of candidates for public office." Id. at 774.  Thus, the Court applied strict scrutiny to determine if the announce clause was narrowly tailored to serve a compelling state interest.  Id. at 774-75.  The Defendants proffered two interests, which they argued were sufficiently compelling to withstand strict scrutiny: "preserving the impartiality of the state judiciary and preserving the appearance of the impartiality of the state judiciary."  Id. at 775.  The Court, concerned that Defendants had not defined what was meant by "impartiality," supplied three potential understandings of the meaning of the term.  Id. at 775-79.

The first meaning posited by the Court was "the lack of bias for or against either *party* to the proceeding.  Impartiality in this sense assures equal application of the law.  That is, it

guarantees a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party." Id. at 775-76. This meaning of impartiality is based on the proposition "that an impartial judge is essential to due process." Id. at 776. The Court did not decide whether this meaning of impartiality amounts to a compelling state interest, however, because it found that the announce clause was "barely tailored to serve that interest *at all*, inasmuch as it does not restrict the speech for or against particular *parties*, but rather speech for or against particular *issues*." Id.[2]

The Court next posited a meaning of impartiality defined as a "lack of preconception in favor of or against a particular *legal view*." Id. at 777. This meaning was summarily rejected as constituting a compelling state interest. First, it would be "virtually impossible to find a judge who does not have preconceptions about the law." Id. Second, "even if it were possible to select judges who did not have preconceived views on legal issues, it would hardly be desirable to do so." Id. at 778. Having no view on legal issues suggests lack of intellectual qualification rather than lack of bias. Accordingly, the Court found that "avoiding judicial preconceptions on legal issues is neither possible nor desirable" and therefore the appearance impartiality under that definition "can hardly be a compelling state interest either." Id.

The final possible meaning of impartiality the Court discussed "might be described as openmindedness." Id. The Court explained:

> This quality in a judge demands, not that he have no preconceptions
> on legal issues, but that he be willing to consider views that oppose
> his preconceptions, and remains open to persuasion, when the issues

---

[2] Presumably, the same rationale explains why the announce clause also did not serve the compelling state interest of preserving the appearance of impartiality.

> arise in a pending case.  This sort of impartiality seeks to guarantee
> each litigant, not an *equal* chance to win the legal points in the case,
> but at least *some* chance of doing so.

Id.  The Court declined to decide whether this meaning of impartiality constituted a compelling

state interest because even if it did, the announce clause was not adopted for the purpose of

serving that interest.  Id.  In essence, the announce clause was not narrowly tailored to meet this

purpose and the prohibition against statements made during a campaign abridged such a small

segment of the public comments a candidate could make that the announce clause was "so

woefully underinclusive as to render belief in that purpose a challenge to the credulous."  Id. at

780.

In deciding White I, the Court signaled a strong defense for speech on political issues:

"the notion that the special context of electioneering justifies an *abridgement* of the right to

speak out on disputed *issues* sets our First Amendment jurisprudence on its head."  Id. at 781

(second emphasis added).  The Court has "never allowed the government to prohibit candidates

from communicating relevant information to voters during an election."  Id. at 782.  It did

recognize, however, a distinction between judicial elections and legislative elections.  The Court

counseled that White I  was meant "neither [to] assert nor imply that the First Amendment

requires campaigns for judicial office to sound the same as those for legislative office."  Id. at

783.  The Court then reversed both the District Court and the Eighth Circuit and remanded the

case to the Eighth Circuit.

Courts were provided with some guidance by the Supreme Court's pronouncements in

White I.  First, it definitively struck down the announce clause.  The intersection of judicial

elections and First Amendment rights was clarified.  Impartiality as a lack of bias against parties

appeared to be a compelling state interest.  Impartiality as openmindedness might be a

compelling state interest as well, but that definition was less supported by the Court's rhetoric.

And finally, the Court recognized that there may be situations in which the requirements of the

First Amendment in a judicial campaign differ from those in a campaign for a legislative or

executive office.

     **2.**      <u>**White II**</u>

     In <u>White II</u>, the Eighth Circuit, sitting en banc, considered challenges to two clauses in

the Minnesota Code of Judicial Conduct.  The first challenged clause, the "partisan-activities

clause," prohibited judges and judicial candidates from (1) "identify[ing] themselves as members

of a political organization, except as necessary to vote in an election"; . . . (2) "attend[ing]

political gatherings"; or (3) "seek[ing], accept[ing] or us[ing] endorsements from a political

organization."  Code of Judicial Conduct, Canon 5(A)(1)(a) (2000).  The second challenged

clause, the "old solicitation clause," prohibited candidates from "personally solicit[ing] or

accept[ing] campaign contributions or personally solicit[ing] publicly stated support."  <u>Id.</u>,

Canon 5(B)(2).  The old solicitation clause allowed a candidate to establish a committee to

engage in such activities, but the candidate could not "seek, accept, or use political organization

endorsements."  <u>Id.</u>  The committee also could not disclose to the candidate the names of

contributors or who declined to contribute.  <u>See id.</u>

     The Eighth Circuit began its analysis with the premise that "[p]rotection of political

speech is the very stuff of the First Amendment."  <u>White II</u>, 416 F.3d at 748.  It then explained

what it meant by a "compelling" interest:

          A clear indicator of the degree to which an interest is "compelling"
          is the tightness of the fit between the regulation and the purported

> interest: where the regulation fails to address significant influences
> that impact the purported interest, it usually flushes out the fact that
> the interest does not rise to the level of being "compelling."  If an
> interest is *compelling* enough to justify abridging core constitutional
> rights, a state will enact regulations that substantially protect that
> interest from similarly significant threats.

Id. at 750.  The court then considered the three meanings of impartiality considered in White I.

The court found that when impartiality is understood as a lack of bias for or against a party it is

"substantially evident that *this* meaning of impartiality describes a state interest that is

compelling."  Id. at 753.

The court next considered whether the partisan-activities clause was narrowly tailored to

address this interest.  It found that to the extent that the clause sought "to keep judges from

aligning with particular views on issues by keeping them from aligning with a particular political

party, the clause is . . . 'barely tailored' to affect any interest in impartiality toward parties."  Id.

at 754.  The court also clarified that bias has to stem from something more than mere association

with a political party because "the associational activities restricted by [the partisan-activities

clause] are, as we have pointed out, part-and-parcel of a candidate's speech for or against

particular *issues* embraced by the political party.  And such restrictions, we have also said, do

not serve the due process rights of *parties*."  Id. at 755.  Finally, in cases where a political party

is a litigant, the court found that "recusal is the least restrictive means of accomplishing the

state's interest in impartiality articulated as a lack of bias for or against parties to the case."  Id.

Similarly, recusal is the best way of serving the interest of protecting the appearance of bias in

such situations.  Id.  Therefore, the court found the partisan-activities clause unconstitutional.

The court also found the old solicitation clause to be unconstitutional.  In White II, the

plaintiffs challenged only "the fact that they [could not] solicit contributions from large groups

15

and [could not], through their campaign committees, transmit solicitation messages above their personal signatures." Id. at 764. The court found that preventing candidates "from directly soliciting money from individuals who may come before them certainly addresses a compelling state interest in impartiality as to parties to a particular case." Id. at 765. This interest was not narrowly tailored, however, because the old solicitation clause required that contributions be made to the candidate's campaign committee. Id. Thus, even if a candidate signed his name on a contribution letter or made a request to a large assembly of voters, he would not know who contributed since such contributions went through his campaign committee. Id.

In sum, White I and White II provide several principles that serve as the framework for consideration of the challenges in this case. First, there is a core First Amendment right for a candidate to speak about his qualifications for political office. Second, any regulation that abridges speech about political issues must have the tightest possible fit between the ends and the means, but judicial elections need not be identical to other types of elections. Third, impartiality, when defined as a lack of bias for or against a party, is a compelling interest, but that interest must relate to actual bias against parties, not issues. Fourth, recusal is the best method of addressing bias when a political party with which a judge associates comes before him. And lastly, because Minnesota requires a candidate to establish a campaign committee, and because the committee is forbidden from disclosing information about who did and did not contribute to the candidates, a candidate may sign his name to a contribution letter and address large assemblies of voters. With the parameters of the rights of judicial candidates set, the Court can address the canons challenged in this case.

**D.      Wersal's Challenges**

**1.      The Endorsement Clause**

The endorsement clause prohibits a judge or candidate for election to judicial office from "publicly endors[ing] or, except for the judge or candidate's opponent, publicly oppos[ing] another candidate for public office."  Code of Judicial Conduct, Canon 5A(1)(b).  Wersal seeks to endorse candidates for offices other than the one he seeks.  By doing so, he argues he would be exercising his right to "announc[e] his position on a disputed political issue, namely whether that candidate should be elected."  Pl.'s Mem. in Supp. of Summ. J. at 12.  He contends that his endorsement of candidates serves as a shorthand for his views on political issues.  Id. Defendants argue that the endorsement clause is necessary to protect judicial impartiality whether defined as either bias for or against a party to a proceeding or openmindedness, or both. Defs.' Mem. in Supp. of Summ. J. at 16, 25.

White I established that the endorsement clause is subject to strict scrutiny.  536 U.S. at 774.  Under strict scrutiny, Defendants have the burden of demonstrating that the restriction is (1) narrowly tailored (2) to serve a compelling state interest.  Id. at 775.  As a general rule, strict scrutiny is "an end-and-means test that asks whether the state's purported interest is important enough to justify the restrictions it has placed on the speech in question in pursuit of that interest."  White II, 417 F.3d at 750.  If "the regulation fails to address significant influences that effect the purported interest, it usually flushes out the fact that the interest does not rise to the level of being 'compelling.'"  Id.  The Eighth Circuit has found that Defendants have a compelling interest in upholding both the impartiality of the judiciary and the appearance of impartiality, defined as a lack of bias for or against a party.  Id. at 753.  The remaining question,

17

therefore is whether the endorsement clause is narrowly tailored to serve this interest.

The endorsement clause prohibits a single type of narrowly defined speech: the ability of a judicial candidate to endorse or oppose a candidate for a different office. A whole realm of speech remains available to that candidate. He can publicly state his position on any other issue. He can attend a political rally. He can send out campaign literature. He can solicit and accept endorsements from political and other organizations. He can associate himself with a political party and publicly state his political affiliations. He can accept campaign funds (through his political committee) and speak at (sufficiently large) fund raisers for his candidacy. In fact, the only political issue about which he is not able to speak is one that is only tangentially related to his own election; the political election of another candidate. The precise reason he is not allowed to speak on this issue is that a legitimate impartiality concern is created when he endorses a candidate who may come before him in his judicial capacity.

Wersal presents a number of arguments as to why the endorsement clause is not narrowly tailored to address these impartiality concerns. The first is that the endorsement of a candidate serves as a proxy for his position on issues. He argues the endorsement clause functions much like the partisan-activities clause in White II and, therefore, the fit between the compelling interest and the endorsement clause is too loose to withstand strict scrutiny. Wersal's argument is unconvincing. Unlike the partisan-activities clause that prohibited a large range of political speech and specifically, "speech about the qualifications of candidates for public office," the endorsement clause does not circumscribe such a broad array of First Amendment rights but rather one specific right because it conflicts with the state's interest in impartial, unbiased judges. White I, 536 U.S. at 774. Accordingly, the link between engaging in partisan-activities,

18

such as attending a political rally, and taking a position on an issue is not nearly as attenuated as the link between supporting a candidate and taking a position on an issue.  While undoubtably instances may arise in which endorsement of a particular candidate might serve as a proxy for a position on an issue, this connection lacks the force and immediacy society applies to the political organization–political issue link. Moreover, to the extent that what Wersal seeks is the ability to comment on an issue, he can state his position without running afoul of the endorsement clause.  If, for example, he wishes to state that the cause of the current financial crisis was hyper-regulation, he can publically take that position and does not need to endorse Congresswoman Michelle Bachmann as a proxy for that position.

Furthermore, the state has a valid impartiality concern, and Wersal possesses many alternate channels through which he may exercise his First Amendment right that do not trigger this concern.  The only political right impinged by the endorsement clause is the right to state one's opinion about whether another candidate should be elected; and that right may be circumscribed, as long as it is done narrowly, in furtherance of the state's interest in prohibiting judicial bias and the appearance of judicial bias.

Wersal also argues that the endorsement clause cannot be narrowly tailored because White II held that recusal is the proper method to cure the impartiality concern.  Wersal overstates White II's holding.  The recusal option discussed in White II was applied in the context of a judge being assigned to hear a redistricting case and the political party/litigant was one with which the judge was associated.  Id. at 755.  In a redistricting case, recusal is a workable, less restrictive means of dealing with potential bias.  These cases are relatively rare and if a judge recuses, a replacement judge can hear the case without restructuring the

assignment system. The same cannot be said about the workability of recusal when a judge endorses an individual who is elected to a position where he or she is frequently a litigant. Repetitive recusals may not be an option if the State seeks to have a viable judicial assignment system. For example, if the judge endorses a sheriff or county attorney in the jurisdiction where the judge presides, the judge should recuse every time one of those individuals, or their agents, appears in the judge's courtroom. In certain jurisdictions, particularly those with a small number of judges, this creates an insurmountable burden for the court system. Although the problem may be manageable in larger counties, a district in which there are only one or two judges would be hamstrung. The endorsement of individual candidates differs markedly from accepting or receiving endorsements from a political party, and, therefore, recusal as a less restrictive means of narrowly tailoring to the impartiality concern is unworkable.[3]

Additionally, the endorsement of individual candidates raises a *quid pro quo* concern each time an individual endorsee appears in court before the endorser judge. Unlike the situation in which a litigant or attorney shares the judge's affiliation with a political party, the impartiality concerns are much stronger when the endorsee appears before the judge because of the link between individuals. The aura of partiality looms greater in this type of situation.

Wersal cites several cases to support his position that courts have invalidated judicial canons with "similar or identical language to [the endorsement clause] challenged here." Pl.'s Mem. in Supp. of Summ. J. at 8. In Weaver v. Bonner, the court struck down a judicial canon that prohibited a candidate from making statements he reasonably should know are false or

---

[3] For the same reasons, accepting endorsements from individual candidates may be equally problematic. That question, and whether the Minnesota Judicial Code of Conduct would allow that practice, however, is not before the Court.

misleading or that create an unjustified expectation of what the candidate could achieve. 309 F.3d 1312, 1315 (11th Cir. 2002). The court found that the state could not sanction negligent statements and any prohibition must be directed at statements made with knowledge of their falsity and with actual malice. Id. at 1319. This canon is factually distinct from the endorsement clause and is of little value in the analysis of the issue presented in the instant case.

Wersal also relies on a circuit court opinion, which struck down a judicial canon that prohibited candidates from making "pledges or promises of conduct in office . . . [and] mak[ing] statements that commit or appear to commit the candidate with respect to cases that are likely to come before the court." Fam. Trust Found. of Kentucky, Inc. v. Kentucky Judicial Conduct Comm'n, 388 F.3d 224, 227 (6th Cir. 2004). Similar inclusion of a "pledges and promises clause" or "commits clause" has also been found to be unconstitutional by numerous District Courts. See Duwe v. Alexander, 490 F. Supp. 2d 968 (W.D. Wis.. 2007); Kansas Judicial Watch v. Stout, 440 F. Supp. 2d 1209 (D. Kan. 2006); Alaska Right to Life Pol. Action Comm. v. Feldman, 380 F. Supp. 2d 1080 (D. Alaska 2005); North Dakota Fam. Alliance, Inc. v. Bader, 361 F. Supp. 2d 1021 (D.N.D. 2005). The rationale for striking these clauses follows the analysis the Eighth Circuit applied in White II; these clauses prevent candidates from speaking about political issues. See e.g. Bader, 361 F. Supp. 2d at 1039 ("The 'appear to commit' prohibition clearly renders the canon indistinguishable from the 'announce clause' which was struck down as unconstitutional in White [I]."). Unlike these clauses, the endorsement clause targets only bias toward an individual and does not restrict the ability to address political issues, a practice now allowed under the current canons. Because the endorsement clause does not implicate political issues and is narrowly tailored to prevent bias against an individual party, this

line of cases is inapposite.

Additionally, no other court confronted with an endorsement clause containing similar language to the Minnesota canon has found it to be unconstitutional.  In <u>Carey v. Wolnitzek</u>, the court determined that the plaintiff's challenge was not ripe for judicial review.  No. 3:06-36-KKC, 2006 WL 2916814, at *14 (E.D.Ky Oct. 10, 2006).  The New Mexico Supreme Court upheld a judicial canon that prohibited a judge or judicial candidate from "publicly endors[ing] or publicly oppos[ing] a candidate for public office through the news media or in campaign literature" finding that the clause was "narrowly tailored to serve the State's compelling interest in a judiciary that is both impartial in fact and in appearance."  <u>In re Matter of William A. Vincent, Jr.</u>, 172 P.3d 605, 606, 608-09 (N.M 2007).  The New York Court of Appeals also upheld a similar endorsement clause finding the prohibited activities were ancillary to the plaintiff's political campaign, and while the court must consider the candidate's First Amendment rights, "it must simultaneously ensure that the judicial system is fair and impartial for all litigants, free of the taint of political bias or corruption, or even the appearance of such bias or corruption."  <u>In re Matter of Ira J. Raab</u>, 793 N.E.2d 1287, 1292 (N.Y. 2003).  Finally a district court in Kansas recently found that the endorsement clause at issue only "restricts a judge or judicial candidate from publicly endorsing other candidates for public office; it does not restrict speech concerning disputed political issues."  <u>Yost v. Stout</u>, No. 06-4122-JAR, slip op. at 12 (D. Kan. Nov. 16, 2008).

In sum, the Minnesota endorsement clause is narrowly tailored to serve a compelling government interest, namely preventing bias and the appearance of bias for or against an individual.  Unlike the partisan-activities clause that was found unconstitutional by the Eighth

Circuit, the endorsement clause is aimed at preventing bias against parties and is not a prohibition against speaking about various issues.  Recusal as a less restrictive means of achieving this interest is impracticable.  Finally, no court has yet found an endorsement clause unconstitutional.  For these reasons, summary judgment in favor of Defendants is granted on Wersal's challenge to the endorsement clause.

### 2.    The Solicitation Clause

Wersal's final challenge is to the solicitation clause, which prohibits a judge or judicial candidate from "personally solicit[ing] campaign contributions . . . and personally accept[ing] campaign contributions."  Code of Judicial Conduct, Canon 5B(2).  Judicial candidates are allowed to establish committees to solicit and accept campaign funds or public statements of support.  Id.  The identity of campaign contributors or those that decline to contribute to the campaign may not be disclosed to the candidate.  Id.  Candidates may solicit campaign contributions when speaking to groups of twenty or more people, and they may sign letters for distribution by the candidate's campaign committee if the letter directs contributions to the committee and not the candidate.  Id.

The constitutionality of this solicitation clause requires application of the strict scrutiny standard.  White II, 416 F.3d at 764.  In White II, the court announced preventing judicial candidates "from directly soliciting money from individuals who may come before them certainly addresses a compelling state interest in impartiality as to parties in a particular case." Id. at 765.  The issue before the Court pivots on whether the solicitation clause is narrowly tailored to serve this compelling interest.

Wersal argues that it is not narrowly tailored because the state's interest in preventing

23

bias comes not from solicitation of funds, but the receipt of them.  For this proposition, he relies

on an Eleventh Circuit case in which the court found that "even if there is a risk that judges will

be tempted to rule a particular way because of contributions . . ., this risk is not significantly

reduced by allowing the candidate's agent to seek these contributions and endorsements on the

candidate's behalf rather than the candidate seeking them himself."  Weaver 309 F.3d at 1322-

23.  Wersal does not address a key distinction between the solicitation clause invalidated in

Weaver and the one at issue in this case.  In Weaver, the members of a candidate's committee

were not prohibited from passing donor information on to the candidate.  Because the donor

information was readily available to the candidate, the clause was not narrowly tailored to

prevent bias and the appearance of bias.

The Minnesota solicitation clause does include a prohibition designed to insulate the

judicial candidate from the contribution information.  Specifically, "committees shall not

disclose to the candidate the identity of those who were solicited for contributions and refused

such contributions."  Code of Judicial Conduct, Canon 5B(2).  Significantly, in rejecting the

large group solicitation and signature bans in White II, the Eighth Circuit found these

prohibitions were not narrowly tailored precisely because "Canon 5 provides specifically that all

contributions are to be made to the candidate's *committee*, and the committee 'shall not' disclose

to the candidate those who either contributed or rebuffed a solicitation."  416 F.3d at 765.  The

Eighth Circuit reasoned that since the non-disclosure requirement in the solicitation clause was

narrowly tailored to serve the state's interest in preventing bias and the appearance of bias, the

large group solicitation and signature bans were unnecessary and concomitantly,  not narrowly

tailored.  White II does not suggest that the Eighth Circuit looks favorably on personal

solicitation by judicial candidates, and this Court is disinclined to do so as well.

Other courts that have invalidated personal solicitation clauses have done so only in the jurisdictions where the campaign committee could disclose to the candidate whether a solicitee had contributed to the campaign or not.  See Yost, No. 06-4122-JAR, slip op. at 20; Carey, 2006 WL 2916814, at *18 (also finding that the solicitation clause did not serve a compelling state interest in preventing bias against parties).

Wersal counter argues the committee does not effectively insulate the candidate because laws requiring public disclosure of political contributions allow candidates to determine who contributed to their campaign.  This argument is unavailing for several reasons.  First, the contribution laws existed when the Eighth Circuit wrote approvingly of the ban on the committee relaying this disclosure information to the candidate in White II and thus, this argument has been considered.  See Minn. Stat. § 10A.20 (enacted 1974).  Second, the appearance of bias is heightened when an agent acting on behalf of a candidate solicits funds and then reports the results directly to the candidate.  If a candidate chooses to have access to a public disclosure report when the reports are periodically filed, the concern of impropriety is diminished both by the delayed access and the indirect route to the knowledge of contributions made.  If the state's interest were only in preventing actual bias, then Wersal's public disclosure law argument would have more force.  But given the state's additional interest in preventing the appearance of bias, and the *quid pro quo* intimations inherent when a candidate solicits contributions one-to-one, the solicitation clause is narrowly tailored to serve that interest.

Wersal also argues that the solicitation clause is not narrowly tailored because it allows candidates to solicit contributions in speeches to groups of 20 or more people, and there is no

indication that 20 is anything other than an arbitrary number.  The decision to set the number at 20 was not determined by whim.  Defendants considered the opinion in <u>White II</u>, in which the Eighth Circuit found unconstitutional the banning of large group solicitations, and also followed the Eighth Circuit's analysis that a ban on personal solicitation was acceptable as long as candidates solicited through their campaign committees and those committees followed the non-disclosure requirement.  The Defendants then decided on a number that prevented personal solicitation but allowed solicitations to a larger group.  The decision was that in groups of less than twenty, the concern that candidates would appear to be compromised outweighed the candidate's right to solicit to large groups, a balance dictated by <u>White II</u>.   The setting of the group size at a minimum of twenty persons is not talismanic, but the inclusion of a number does not, by itself, establish an arbitrary political speech restriction.  <u>See</u> <u>Burson v. Freeman</u>, 504 U.S. 191, 209 (1992) (finding that when a state seeks to prevent political speech near polling places, "requiring proof that a 100-foot boundary is perfectly tailored to deal with voter intimidation and election fraud would necessitate that the State's political system sustain some level of damage before the legislature could take corrective action.  Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight . . . provided that the response is reasonable and does not *significantly impinge* on constitutionally protected rights").  Finally, Wersal renews his argument that recusal is a less restrictive means of preventing bias.  The explanation for rejecting recusal as a viable option under the endorsement clause also applies for the solicitation clause.  Additionally, the Eighth Circuit did not suggest recusal as a proper means of tailoring under the old solicitation clause, and this Court will follow its lead.  Finally, the rash of recently filed petitions for Writ of Certiorari indicate that recusal may not be

an effective method of preventing bias and ensuring justice.  <u>See</u> Petition for Writ of Certiorari, <u>Avery v. State Farm Mut. Auto. Ins. Co.</u>, 2005 WL 3662258, at *i (U.S. Dec. 27, 2005), *cert. denied*, 547 U.S. 1003 (2006); <u>Caperton v. A.T. Massey Coal Co., Inc.</u>, No. 33350, __ S.E.2d __, 2008 WL 918444 (W. Va. Apr. 3, 2008), *cert. granted*, 2008 WL 2714888 (U.S. Nov. 14, 2008). For these reasons, summary judgment for the Defendant on the issue of the constitutionality of the solicitation clause is granted

## IV. CONCLUSION

    Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff Gregory Wersal's Motion for Summary Judgment [Docket No. 37] is **DENIED** and Defendants' Motion for Summary Judgment [Docket No. 26] is **GRANTED**.

    **LET JUDGMENT BE ENTERED ACCORDINGLY.**

                                                    BY THE COURT:


                                                    _____s/Ann D. Montgomery_____
                                                    ANN D. MONTGOMERY
                                                    U.S. DISTRICT JUDGE

Dated:  February 4, 2009.